NOT DESIGNATED FOR PUBLICATION

No. 121,827

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TYJUANA L. JACKSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed October 8, 2021. Affirmed.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Marc A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., POWELL and HURST, JJ.

POWELL, J.: Tyjuana L. Jackson was convicted by a jury of her peers of one count of voluntary manslaughter after she shot and killed an innocent bystander at a nightclub during an altercation between herself and her paramour's wife. Jackson now appeals, arguing (1) jury instruction errors entitle her to a new trial and (2) her sentence is illegal. After a careful review of the record, we find the district court's failure to give a reckless involuntary manslaughter instruction to be harmless error but otherwise affirm the jury instructions given. As to Jackson's sentence, we find no error in the district court's

calculation of her criminal history score, nor is the district court's restitution order illegal. Thus, we affirm Jackson's conviction and sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

A five-year affair between Jackson and Phillip Watson led to the death of Michael Williams, an innocent bystander, on March 17, 2018. LaShonda Watson, Phillip's wife, was aware of the affair, but she testified she believed the affair between the two had ended at the time of the altercation.

On March 15, 2018, Jackson and Phillip were exchanging text messages when Phillip sent Jackson a message stating, in part:  "Now it seems [LaShonda] wants to cause me major problems and I don[']t [want] nobody getting hurt, cause she's talking about killing me and whomever she caught me wit[h] until our divorce is [f]inal." Jackson, who took the stand in her own defense at trial, testified that she felt frightened and threatened because she believed LaShonda was referring to her in the text message.

The next day, on the evening of March 16, 2018, Jackson met a friend at The Firelight Lounge in Kansas City, Kansas. According to Jackson, at some point in the evening she went into her purse to retrieve a cigarette lighter and found a handgun. She did not inspect the contents of her handbag before arriving at the nightclub that night, and she believed Phillip put the gun in her purse. Although the club had metal detectors, the firearm was not detected by club security.

While Jackson was still at the club, Phillip and LaShonda arrived at The Firelight Lounge shortly after midnight. There, the husband and wife met up with LaShonda's aunt, LaDonna Chandler. LaDonna's boyfriend, Charles Brooks, was working security at the nightclub that evening.

Jackson was talking with a friend at the bar when she decided to go to the dance floor. LaShonda and LaDonna were standing near the dance floor talking to Phillip. Because the club was crowded, Jackson bumped into LaDonna, who was standing near her as Jackson made her way to the dance floor. LaDonna then turned around, bumped into Jackson, and said, "Don't fucking shove me." According to Jackson's testimony, LaShonda then yelled at Jackson, "Bitch, I'm tired of you. I'm going to kill you." LaShonda mentioned Jackson "messing with" her husband. Jackson testified she recalled the text message Phillip had sent her the day before and became frightened.

LaDonna, LaShonda, and Jackson began to physically engage with one another, which was described as "bumping" and "shoving" each other. Brooks began to lead Jackson away, but then LaShonda took one last punch at Jackson, which knocked off her wig. Jackson testified that as she bent down to retrieve her wig, she thought she saw LaShonda reach for a gun.

Jackson began to dig around in her purse, and Brooks began physically restraining Jackson, fearing she was carrying a firearm. Nevertheless, Jackson was able to draw the handgun out of her purse. Brooks tried to force her hand up in an attempt to prevent anyone from getting shot, but Jackson resisted. Brooks testified at the same time he was "begging" for Jackson to give him the gun. During this struggle between Jackson and Brooks, Jackson fired one shot. According to testimony at trial, she kept pulling the trigger to shoot, but the gun jammed. Brooks' hand had an abrasion, and his glove was damaged by the gun when Jackson fired it.

The single shot Jackson was able to fire hit an innocent bystander, Williams, in the head and killed him. Jackson and Brooks walked over and looked at Williams' body, and Jackson eventually surrendered her gun to Brooks. Upon doing so, Jackson then fled the scene. She turned herself in to police nine days later.

Jackson testified that when she drew the gun, she intended "to defend [her]self," but, when repeatedly asked, never clarified what she meant by "defend [her]self" and if that meant she intended to fire the gun. She did testify, "I don't—I don't know about—anything about a gun, so I just knew that if somebody had a gun and they were going to pull it out on me, I was going to pull one back out." According to her, as soon as she grabbed the gun out of her bag, "immediately Charles [Brooks] grabbed [her] hand and the gun went off."

The altercation and shooting were captured on surveillance camera footage, which was played for the jury.

The State charged Jackson with first-degree premeditated murder of Williams, based on a transferred intent theory, and aggravated battery of Brooks.

The district court instructed the jury on first-degree premeditated murder, along with the lesser included offenses of second-degree intentional murder, voluntary manslaughter under a theory of an unreasonable but honest belief that circumstances existed which justified the use of deadly force (imperfect self-defense), and involuntary manslaughter under a theory of a lawful act in an unlawful manner. The district court also instructed the jury on self-defense.

The jury returned a verdict of guilty of the lesser included offense of voluntary manslaughter and acquitted Jackson of aggravated battery. On August 9, 2019, the district court sentenced Jackson to a standard term of 102 months' imprisonment and ordered Jackson to pay $5,000 in restitution to the Crime Victims Compensation Board.

Jackson timely appeals.

ANALYSIS

Jackson raises seven arguments on appeal, claiming the district court erred by: (1) instructing the jury in a way that precluded consideration of involuntary manslaughter; (2) giving an erroneous self-defense instruction; (3) failing to instruct the jury on the requested lesser included offense of reckless involuntary manslaughter; (4) committing cumulative error as its handling of the jury instructions deprived her of a fair trial; (5) imposing an illegal sentence when it classified her prior identity theft conviction as a person felony; (6) imposing an illegal restitution order because it included no plan for repayment; and (7) violating her rights under the Sixth and Fourteenth Amendments to the United States Constitution when it sentenced her to an increased sentence based upon her prior convictions without requiring the State to prove them beyond a reasonable doubt to a jury.

## I. DID THE DISTRICT COURT GIVE ERRONEOUS JURY INSTRUCTIONS?

When analyzing jury instruction issues, we follow a three-step process by:

> "(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless." *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

The "first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step." *State v. Bolze-Sann*, 302 Kan. 198, 209, 352 P.3d 511 (2015). If the subject jury instruction was requested and not given or objected to and the challenging party does not argue that the failure to instruct violated a constitutional right, any instructional error is reversible only if there is a reasonable probability the error affected the outcome of the trial in light of

the entire record. *State v. Plummer*, 295 Kan. 156, 161-63, 168, 283 P.3d 202 (2012). If the jury instruction was not requested or was not objected to, we review the instruction for clear error. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018).

At the second step, we consider whether the jury instruction was legally and factually appropriate, reviewing the entire record on appeal de novo. *Bolze-Sann*, 302 Kan. at 210.

A. *The district court did not err in instructing the jury to consider voluntary manslaughter before considering involuntary manslaughter.*

Jackson argues the district court erred when it failed to instruct the jury to simultaneously consider voluntary manslaughter and involuntary manslaughter. She complains the standard language of the Pattern Instructions of Kansas (PIK) wrongly prevents jurors from considering involuntary manslaughter until they first consider voluntary manslaughter.

Jackson did not object to the given instructions at trial. Therefore, we apply the clear error standard and will only reverse if an error occurred and we are firmly convinced that the jury would have reached a different verdict if the instruction error had not occurred. As the party claiming a clear error, Jackson has the burden to demonstrate the necessary prejudice. See *McLinn*, 307 Kan. at 318.

Instruction No. 8 reads:

"If you do not agree that the defendant is guilty of Murder in the Second Degree, you should then consider the lesser included offense of Voluntary Manslaughter.
"To establish this charge, each of the following claims must be proved:
"1. The defendant knowingly killed Michael Williams.

6

"2. It was done upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person.

"3. This act occurred on or about the 17th day of March 2018, Wyandotte County, Kansas.

"The State must prove that the defendant committed Voluntary Manslaughter knowingly. A defendant acts knowingly when the defendant is aware of the nature of her conduct that the State complains about or of the circumstances in which she was acting.

"When a homicidal act is directed against one other than the person killed, the responsibility of the actor is the same as it would have been had the act been completed against the intended victim."

Instruction No. 9 reads:

"If you do not agree that the defendant is guilty of Voluntary Manslaughter, you should then consider the lesser included offense of Involuntary Manslaughter.

"To establish this charge, each of the following claims must be proved:

"1. The defendant killed Michael Williams.

"2. It was done during the commission of a lawful act in an unlawful manner.

"3. This act occurred on or about the 17th day of March 2018, Wyandotte County, Kansas.

"When a homicidal act is directed against one other than the person killed, the responsibility of the actor is the same as it would have been had the act been completed against the intended victim."

Contrary to Jackson's argument that the district court should have instructed the jury to consider voluntary manslaughter simultaneously with involuntary manslaughter, the Kansas Supreme Court has held that "a district court is not required to instruct a jury to consider a lesser included homicide offense simultaneously with any greater homicide offense." *State v. Sims*, 308 Kan. 1488, 1503, 431 P.3d 288 (2018); see *State v. James*, 309 Kan. 1280, 1305, 443 P.3d 1063 (2019) ("The district judge did not err by failing to instruct the jury to consider lesser included crimes simultaneously.").

Moreover, our Supreme Court has characterized the portion of the jury instruction in Instruction No. 9 of which Jackson complains—"If you do not agree that the defendant is guilty of Voluntary Manslaughter, you should then consider the lesser included offense of Involuntary Manslaughter"—as a "transitional statement that offers an orderly method by which the jury can consider possible verdicts." *Sola-Morales v. State*, 300 Kan. 875, 886, 335 P.3d 1162 (2014).

Jackson attempts to sidestep the *Sims* precedent by arguing that K.S.A. 2020 Supp. 22-3414(3) required the district court to have the jury simultaneously consider voluntary manslaughter and involuntary manslaughter. Yet such an interpretation is not found in the plain language of the statute. K.S.A. 2020 Supp. 22-3414(3) states, in applicable part: "In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (b) of K.S.A. 21-5109, and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime." This statutory language does not require simultaneous instructions. Thus, it was not legally appropriate for the district court to instruct the jury to simultaneously consider voluntary manslaughter and involuntary manslaughter. There was no error.

B.      *The district court did not err in not giving an ordinary force jury instruction.*

Second, Jackson argues she was entitled to a self-defense instruction under ordinary force as well as deadly force because she only intended to display her firearm rather than shoot it. Such an instruction was not proposed below; therefore, Jackson carries the burden to show clear error. See *McLinn*, 307 Kan. at 318.

K.S.A. 2017 Supp. 21-5221(a) defines use of force and use of deadly force as:

"(1) 'Use of force' means any or all of the following directed at or upon another person or thing: (A) Words or actions that reasonably convey the threat of force, including threats to cause death or great bodily harm to a person; (B) the presentation or display of the means of force; or (C) the application of physical force, including by a weapon or through the actions of another.

"(2) 'Use of deadly force' means the application of any physical force described in paragraph (1) which is likely to cause death or great bodily harm to a person. Any threat to cause death or great bodily harm, including, but not limited to, by the display or production of a weapon, shall not constitute use of deadly force, so long as the actor's purpose is limited to creating an apprehension that the actor will, if necessary, use deadly force in defense of such actor or another or to affect a lawful arrest."

K.S.A. 2017 Supp. 21-5222 outlines the circumstances under which ordinary and deadly force may be used:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person."

Instructions No. 12 and 13 provided the jury with the law it was to follow regarding Jackson's use of deadly force in self-defense. Instruction No. 12 read:

"Defendant Tyjuana Jackson claims her use of force was permitted as self-defense. Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to her and

9

she reasonably believes such force is necessary to prevent death or great bodily harm to herself from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

"When use of force is permitted as self-defense there is no requirement to retreat."

Instruction No. 13 instructed the jury:

"The defendant raises self-defense as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State has the burden to disprove this defense beyond a reasonable doubt. The State's burden of proof does not shift to the defendant."

These instructions mirror PIK Crim. 4th 52.200 (2019 Supp.) and PIK Crim. 4th 51.050 (2020 Supp.).

The language for an ordinary force self-defense instruction tracks with Instruction No. 12, except instead of stating: "Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm . . .", the language would have read: "Defendant is permitted to display to another person a firearm." PIK Crim. 4th 52.200. Under the facts of this case, this proposed ordinary force language was not factually appropriate.

A use of an ordinary force instruction is appropriate when a firearm is merely displayed, whereas the use of a deadly force instruction is appropriate when a firearm is discharged. See *State v. Thomas*, 311 Kan. 403, 415, 462 P.3d 149 (2020). Compare *State v. Sanders*, No. 103,171, 2011 WL 3276191, at *5 (Kan. App. 2011) (unpublished opinion) (holding jury instruction appropriate on [ordinary] "use of force" in self-defense when defendant pointed gun but did not fire), with *State v. Hardy*, 305 Kan. 1001, 1012-

10

13, 390 P.3d 30 (2017) (holding self-defense immunity for "use of deadly force" when defendant fired gun). See also 2 LaFave, Substantive Criminal Law § 10.4(a) (3d ed. 2018) ("But merely to threaten death or serious bodily harm, without any intention to carry out the threat, is not to use deadly force, so that one may be justified in pointing a gun at his attacker when he would not be justified in pulling the trigger.").

Before we get into the merits of Jackson's argument, we pause to repeat a point alluded to early on in the opinion. Jackson's actions were directed against her antagonist, LaShonda, but it was Williams who was shot and killed. Jackson was prosecuted under a transferred intent theory, which "clarifies that evidence of a defendant's intent to kill a particular person can prove intent to kill a human being even if a person other than the intended victim is murdered at the defendant's hands." *State v. Seba*, 305 Kan. 185, 198, 380 P.3d 209 (2016). Hence, as a legal matter, even though Jackson shot Williams, it was the intent of her acts towards LaShonda that matter.

Here, while Jackson tacitly testified she only intended to show the handgun, that is not the force that she ultimately used. It is undisputed that Jackson shot Williams with her gun. It is illogical to argue that Williams was killed via the mere display of a firearm. Regardless of Jackson's subjective intent, she employed deadly force which resulted in a death. It was Jackson's use of deadly force that needed to be justified under a self-defense theory because that is the force that caused Williams' death.

To elaborate, when asked about her use of force on direct examination, Jackson testified as follows:

> "[JACKSON]: As I'm picking up my wig, I notice I'm down and I notice LaShonda is down as well. And I see her picking up a gun off the floor, a silver gun.
> "[DEFENSE]: Describe that gun to the best of your ability.

11

"[JACKSON]: I'm not real familiar with guns, but it was a—kind of a handgun. It was silver. It was kind of this big, (indicating).

"[DEFENSE]: And for the record, you are holding your fingers apart what appears to be maybe 9 to 12 inches?

"[JACKSON]: Yes, sir.

"[DEFENSE]: What did you think at that moment?

"[JACKSON]: My life flashed in front of my eyes. I thought she was going to kill me.

"[DEFENSE]: What did you do next?

"[JACKSON]: I went into my bag and grabbed the gun that was in my bag.

"[DEFENSE]: Describe for the jury what happens as you were grabbing that gun out of the bag.

"[JACKSON]: As I grabbed the gun out of the bag—I pulled it out, and immediately Charles grabbed my hand and the gun went off.

"[DEFENSE]: And can you give a little bit better indication of where the gun was when it went off?

"[JACKSON]: I believe it would probably be up above, kind of like—level— level with my head, (indicating).

"[DEFENSE]: And for the record, you were holding your right arm up?

"[JACKSON]: Yes, sir.

"[DEFENSE]: Did you grab it with your right hand?

"[JACKSON]: Yes, sir, I did.

"[DEFENSE]: Again, what side of the—of your body was the purse on at this point in time?

"[JACKSON]: At this point in time, once I had fell up—it ended up getting in my left hand.

"[DEFENSE]: You pulled the gun out; correct?

"[JACKSON]: Yes, sir, I did.

"[DEFENSE]: And then you said just a moment ago—and for the record, you were holding your hand up right at about eye level?

"[JACKSON]: Yes, sir.

"[DEFENSE]: How did it get up to that level?

"[JACKSON]: I—as soon as I pulled it out, I—it came out at that level.

"[DEFENSE]: And what did Charles do?

"[JACKSON]: He grabbed it.

"[DEFENSE]: And what happened next?

"[JACKSON]: The gun discharged.

"[DEFENSE]: And were you pulling that gun out to defend yourself?

"[JACKSON]: Yes, I was.

"[DEFENSE]: And why did you think you needed to pull that gun out to defend yourself?

"[JACKSON]: Because I was scared for my life. They—LaShonda had a gun, and I—I wanted to defend myself. I felt like if she was going to shoot me—I mean, I wanted to have a gun as well that—to defend myself with."

On cross-examination, the State attempted to get Jackson to clarify her thoughts when she drew the firearm.

"[STATE]: In the club when you discovered—you said at some point you reached in to find a lighter and you found that you were carrying a gun; is that right?

"[JACKSON]: Yes, sir.

"[STATE]: Did you check to see if there was a round that was chambered?

"[JACKSON]: I don't know anything about firearms, so I would not know how to check to see if there's anything like you said, a chamber or anything.

"[STATE]: So is it—so you just assumed then when you did decide to pull the gun out that it would be ready to fire?

"[JACKSON]: I just assumed that when I pulled the gun out I was defending myself. I didn't intend to fire the gun. I did intend to defend myself. I never intended to—

"[STATE]: How were you going to defend yourself without firing the gun?

"[JACKSON]: I don't—I don't know about—anything about a gun, so I just knew that if somebody had a gun and they were going to pull it out on me, I was going to pull one back out.

"[STATE]: And when you pulled that gun out—well, I'll ask you, have you ever shot that gun before?

"[JACKSON]: I have never shot a gun, period, in my life.

"[STATE]: But you knew how to hold it; fair to say?

"[JACKSON]: Well, yes, sir.

13

"[STATE]:     Okay. And you just assumed then that you were going to be able to point it and fire it once you pulled it out; is that right?

"[JACKSON]:   I just assumed that I would pull the gun out to defend myself.

"[STATE]:     Okay. And I'm asking you, how were you going to defend yourself with a gun other than firing it?

"[JACKSON]:   I—I don't know anything—I don't know—I didn't think—at that time I wasn't saying, 'Well, if I pull this gun out, is it going to fire?'

"[STATE]:     I'll ask it differently. When you pulled that gun out, were you planning to use it to throw it at [La]Shonda?

"[JACKSON]:   I was planning to use it to defend myself, sir.

"[STATE]:     And I'm asking about how you'd defend yourself. Were you going to use it to hit her back with it?

"[JACKSON]:   I was planning to defend myself.

"[STATE]:     Ms. Jackson, how were you going to use that gun to defend yourself?

"[JACKSON]:   Well, I assume that when she seen that I had a gun that she would know that I had a gun as well."

Moreover, after the first shot was fired, Jackson continued to pull the trigger, but the gun had jammed.

The undisputed facts are that Jackson drew the firearm and Williams was killed while that firearm was in Jackson's hands. That is deadly force. Beyond this consideration, practically speaking, had an ordinary self-defense jury instruction been given and the jury found facts supporting its application, Jackson's proposed ordinary self-defense defense would have only absolved her of guilt through the drawing of the firearm. Jackson is correct that simply drawing a firearm is ordinary force; however, once the firearm was discharged, the line from ordinary force to deadly force was crossed. An ordinary force self-defense instruction was not factually appropriate. Therefore, the district court did not clearly err when it did not give such an instruction.

14

C.	*The district court's failure to give a reckless involuntary manslaughter instruction was harmless error.*

Third, Jackson argues the district court erred in not giving the requested reckless involuntary manslaughter instruction.

Jackson requested a reckless involuntary manslaughter instruction be given to the jury before the district court but does not argue that the failure to instruct violated a constitutional right. Therefore, any instructional error is reversible if we determine there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016). The State, as the party benefitting from the error, has the burden to demonstrate there was no such probability. *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012).

Unfortunately, the precise language that Jackson requested be given cannot be discerned from the record on appeal because her proposed jury instructions are not included in the record. Without the precise requested language, it is difficult to assess if the instruction should have been given. But we assume Jackson's requested instruction would have been based on the PIK and similar to the following language:

> "If you do not agree that the defendant is guilty of voluntary manslaughter, you should then consider the lesser included offense of involuntary manslaughter.
> "To establish this charge, each of the following claims must be proved:
> "1. The defendant killed [Michael Williams].
> "2. The killing was done recklessly.
> "3. This act occurred on or about the [17th] day of [March], [2018], in [Wyandotte] County, Kansas." PIK Crim. 4th 54.180 (2019 Supp.).

Importantly, as discussed, the district court gave an involuntary manslaughter jury instruction based on the killing of Williams occurring during the commission of a lawful act in an unlawful manner.

K.S.A. 2017 Supp. 21-5202 defines the mental states at issue in this case:

"(i) A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result. All crimes defined in this code in which the mental culpability requirement is expressed as 'knowingly,' 'known,' or 'with knowledge' are general intent crimes.

"(j) A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

As a lesser included offense, a reckless involuntary manslaughter jury instruction was legally appropriate. See *State v. Gentry*, 310 Kan. 715, 721, 449 P.3d 429 (2019) (holding involuntary manslaughter is a lesser included offense of first-degree premeditated murder); *Plummer*, 295 Kan. at 161 (holding lesser included offense instruction is legally appropriate).

But an instruction must also be factually appropriate. K.S.A. 2020 Supp. 22-3414(3) requires a district court give a lesser included jury instruction when there is "some evidence which would reasonably justify a conviction of some lesser included crime." That evidence "need not be strong or conclusive to warrant the instruction." *State v. Maestas*, 298 Kan. 765, 779, 316 P.3d 724 (2014). However, when evidence is overwhelming, a defendant's "self-serving statement regarding his [or her] lack of intent

16

[does] not in itself invoke a duty on the trial judge to instruct on recklessness." *State v. Calderon*, 270 Kan. 241, 256, 13 P.3d 871 (2000). "[W]hether an otherwise unsupported and self-serving statement of intent compels a lesser included offense instruction depends on the extent to which the other evidence repudiates the statement." *Seba*, 305 Kan. at 204.

Here, the district judge decided not to give the requested reckless involuntary manslaughter instruction because while it was legally appropriate, it was not factually appropriate. Specifically, there was no evidence that supported a finding that Jackson discharged the firearm recklessly; rather, she testified she was defending herself. The district judge elaborated:

> "I'm not going to give intentional—unintentional or reckless second degree or reckless voluntary manslaughter. I don't believe her testimony or any other testimony in this case—I believe the testimony of the other witnesses, which the Court has to look at—I know any evidence at all includes a defendant's statement, but it also—there's case law that says that this Court can discount if there's other overwhelming evidence regarding that, a defendant's self-serving statement. Her statement here today, while she was asked several times and given several opportunities to describe what happened, she chose not to. *All she kept saying was the gun discharged. She didn't say that it was in a reckless manner. She said she was defending herself. And defending herself—and based on—take that and combine that with the testimony of State's witnesses who said she clearly was firing that gun*, and the intended victim with the understand[ing]—if you take the evidence to be that the intended victim was LaShonda—or I'm sorry, yeah, LaShonda Watson because she—of this affair and because LaShonda had threatened her in a text message two nights before, and then there had been this confrontation at the bar.
>
> "It is clear to this Court that this was not a reckless act on her part. This was not a case where she was just firing into a crowd. It wasn't a case where she was just firing her gun over to scare anyone. It wasn't where she was just firing above everybody's heads. She was trying to shoot LaShonda Watson. And the circumstances are that Charles Brooks grabbed her arm and—at the same time and shot—wherever it went. And it didn't

strike her but struck the—Michael Williams. And so I'm not going to give the lessers of those." (Emphasis added.)

Factually, to obtain a conviction on reckless involuntary manslaughter, there must be evidence that Jackson's act of firing the gun was reckless, not merely that drawing the gun was reckless. There is no connection between an alleged act of recklessly drawing a gun and that gun being discharged. See *Thomas*, 311 Kan. at 414 (distinguishing ordinary force and deadly force, stating "[F]iring one's weapon need not inevitably follow the act of drawing it, either factually or legally."). Thus, we are inclined to agree with the district court's assessment of the factual appropriateness of a reckless involuntary manslaughter instruction.

But according to Jackson's testimony, she did not fire the gun and had no intent to fire the gun at all, be it at LaShonda, Williams, the crowd, or the ceiling. The State responds that this lack of testimony as to intent renders the requested instruction factually inappropriate. Yet, firing of the gun aside, Jackson argues that a reasonable juror could have determined that drawing a gun during a fight in a crowded bar could factually establish a reckless culpable mental state.

When the parties offer a variety of competing reasons why the requested instruction was or was not factually appropriate, we frequently bypass the question of whether the instruction was factually appropriate and move straight to the harmlessness inquiry. Accordingly, we assume, without deciding, that when the evidence is viewed in the light most favorable to Jackson, it was sufficient for a rational fact-finder to find for her on the requested lesser included offense, making Jackson's requested instruction factually appropriate. See *State v. Salary*, 301 Kan. 586, 598-99, 343 P.3d 1165 (2015). Thus, we now proceed directly to determining whether the failure to give the instruction was harmless.

The jury clearly and closely considered the definition of "knowingly," which is the culpable mental state for voluntary manslaughter—Jackson's crime of conviction. See K.S.A. 2017 Supp. 21-5202(i). Specifically, the jury asked: "What is the law's definition of knowingly? Layman's terms." The district court answered this question in the following way: "Please refer to the instructions, which define knowingly. That's the best definition I can give you." Jury instruction No. 8 defined "knowingly" for imperfect self-defense voluntary manslaughter as "The State must prove that the defendant committed Voluntary Manslaughter knowingly. A defendant acts knowingly when the defendant is aware of the nature of her conduct that the State complains about or of the circumstances in which she was acting."

"Recklessly" is a less severe mental state than "knowingly." See *Gentry*, 310 Kan. at 733 ("[T]he State can establish that a defendant acted recklessly if it proves that the defendant acted knowingly or intentionally."); K.S.A. 2020 Supp. 21-5202(c) ("Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. If recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally. If acting knowingly suffices to establish an element, that element also is established if a person acts intentionally.").

When considering the instructions as a whole, had the jury not been convinced beyond a reasonable doubt that Jackson knowingly killed Williams, based on transferred intent, it would not have convicted her of the crime which it did—imperfect self-defense voluntary manslaughter. The jury was given the correct reasonable doubt instruction and unanimity instruction. Had the jury not found evidence of the "knowingly" mental state, it would have acquitted Jackson of this lesser included offense and either convicted her of the involuntary manslaughter crime upon which it was instructed or acquitted Jackson completely. It did not.

Beyond this logical deduction, there was no evidence presented at trial to support a reckless state of mind. First, the firearm had a trigger safety and a grip safety, which would only permit the gun to discharge if it was gripped properly, with a finger on the trigger, and the trigger was pulled. Testimony at trial clearly indicated that such a firearm safety set up prevents accidental discharges and that the gun would had to have been gripped firmly in the firing position with a finger on the trigger and the trigger pulled to be discharged. Moreover, our Supreme Court has held that "a defendant's actions in pointing a gun at someone and pulling the trigger are intentional rather than reckless even if the defendant did not intend to kill the victim." *State v. Bailey*, 263 Kan. 685, 691, 952 P.2d 1289 (1998). So, while Jackson testified she did not intend to kill Williams, or anyone, she nevertheless pointed the gun at eye level at LaShonda and, based on the testimony at trial regarding the trigger and grip safety of the firearm and eyewitness accounts, she pulled the trigger, eliminating any reckless intent. Second, Brooks testified that Jackson continued to pull the gun's trigger even after the first shot was fired, negating any notion of a reckless discharge. Third, Jackson never testified she intended to fire the gun merely to scare LaShonda. The uncontroverted evidence was that to fire the gun it had to be held properly and the trigger had to be pulled properly for the gun to fire. There is no evidence of a malfunction regarding the gun firing that night.

Additionally, the State's theory was that Jackson intentionally killed Williams while trying to shoot LaShonda. Jackson tacitly testified that she never intended to shoot, only brandish, the gun; rather, the firearm discharged unintentionally. But in closing, defense counsel argued that any shooting was intentionally done in self-defense, emphasizing "[Jackson] chose to act" and that she "shot first." Jackson did not argue for acquittal on the theory that she shot unintentionally; she argued for acquittal based on a theory of self-defense, a theory that her actions that night were justified. Yet the jury, in rejecting Jackson's self-defense theory, found that Jackson was not justified in her use of deadly force, and her actions were based upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person.

20

The jury's finding of guilt on imperfect self-defense voluntary manslaughter, combined with the parties' arguments and the ample evidence that Jackson acted knowingly rather than recklessly, show there is no possibility that the jury would have found Jackson killed Williams with mere recklessness had such a jury instruction been given. The error was harmless.

## II.   DID CUMULATIVE ERROR DEPRIVE JACKSON OF A FAIR TRIAL?

Finally, Jackson argues even if none of the jury instruction errors are individually reversible, she should be granted a new trial based on cumulative error.

The test for cumulative error is whether the totality of the circumstances establishes the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, we examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). However, a single nonreversible error does not constitute reversible cumulative error. See *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

Here, Jackson has identified at most one individually harmless error—the failure to give a reckless involuntary manslaughter jury instruction. But this single assumed error is insufficient to find cumulative error. Jackson received a fair trial.

III.  DID THE DISTRICT COURT CORRECTLY CALCULATE JACKSON'S CRIMINAL HISTORY SCORE?

Jackson also attacks her sentence. She argues her sentence is illegal because the district court erroneously classified her prior identity theft conviction as a person offense. Specifically, she argues that although identify theft was classified as a person offense at the time she committed that crime, at the time she committed her crime of current conviction its classification had changed to a nonperson offense and it should have been classified as a nonperson offense for her criminal history score. Jackson objected to the classification of her identity theft conviction at sentencing.

"The proper classification of a prior conviction is a question of law over which we exercise unlimited review." *State v. Dickey*, 305 Kan. 217, 220, 380 P.3d 230 (2016). Similarly, our review to determine whether a sentence is illegal is unlimited. *State v. Neal*, 292 Kan. 625, 630, 258 P.3d 365 (2011).

In 2005, Jackson was convicted of identity theft under K.S.A. 2004 Supp. 21-4018. Under the statute applicable at the time, identity theft was classified as a person offense. K.S.A. 2004 Supp. 21-4018(c). Yet in the 2005 legislative session, the Legislature repealed parts of K.S.A. 21-4018 and replaced it with a new version. See L. 2005, ch. 131. Included in the amendments was the reclassification of identity theft as a nonperson offense. K.S.A. 2005 Supp. 21-4018(c).

K.S.A. 2020 Supp. 21-6810(d)(8)—previously K.S.A. 21-4710(d)(8)—states: "Prior convictions of a crime defined by a statute that has since been repealed shall be scored using the classification assigned at the time of such conviction." Under the plain language of this statute, it appears the district court properly scored Jackson's prior identity theft conviction as a person felony because that is how the conviction was classified prior to its repeal and replacement. Prior to 2015, other panels of this court held

22

that prior post-KSGA Kansas identity theft convictions must be scored as person felonies because the criminal statute was repealed when identity theft was changed from a person felony to a nonperson felony. See *State v. Williams*, No. 106,598, 2012 WL 3290006, at *1-2 (Kan. App. 2012) (unpublished opinion); *State v. Peoples*, No. 102,550, 2010 WL 3984794, at *1 (Kan. App. 2010) (unpublished opinion).

However, in 2015, the Kansas Supreme Court issued *State v. Keel*, 302 Kan. 560, 588, 357 P.3d 251 (2015), which stated that sentences should "reflect ever-evolving sentencing philosophies and correction goals" and opined in dicta that, as such, prior identity theft convictions should be classified to reflect "the current viewpoint on the severity of identity theft."

Yet *Keel* interpreted K.S.A. 21-4710 (now K.S.A. 2020 Supp. 21-6810) to determine how to classify pre-KSGA Kansas felony convictions not designated as either person or nonperson crimes when calculating a defendant's criminal history score for sentencing on a post-KSGA crime. That is not the situation here. The *Keel* court concluded, based on an analysis of K.S.A. 21-4710(d)(9)—now K.S.A. 2020 Supp. 21-6810(d)(8)—that "[t]he clear implication is that if the statute has not been repealed, then the crime is scored using the classification in the statute at the time of the current crime of conviction." 302 Kan. at 580.

Further, *Keel* does not take into account the amendments made to K.S.A. 21-6810 in 2015. L. 2015, ch. 5, § 1. In those amendments, the Kansas Legislature added clarifying language to K.S.A. 21-6810(d)(2). Prior to the amendment, subsection (d)(2) stated:  "All prior adult felony convictions, including expungements, will be considered and scored." However, after the amendment, K.S.A. 2015 Supp. 21-6810(d)(2) stated: "All prior adult felony convictions, including expungements, will be considered and scored. *Prior adult felony convictions for offenses that were committed before July 1, 1993, shall be scored as a person or nonperson crime using a comparable offense under*

23

*the Kansas criminal code in effect on the date the current crime of conviction was committed.*" (Emphasis added.) The Legislature explicitly stated:  "The amendments made to this section by section 1 of chapter 5 of the 2015 Session Laws of Kansas are procedural in nature and shall be construed and applied retroactively." K.S.A. 2020 Supp. 21-6810(e).

Jackson argues that *Keel* and the language in K.S.A. 2020 Supp. 21-6810(d)(2) requiring convictions be scored using the comparable offense "in effect on the date the current crime of conviction was committed" mean that the district court should have used the version of identity theft in effect at the time Jackson committed her present crime of conviction, voluntary manslaughter. However, this argument ignores a very important part of the statute—this subsection applies to "[p]rior adult felony convictions for offenses that were committed before July 1, 1993." K.SA. 2020 Supp. 21-6810(d)(2). Jackson's prior identity theft conviction does not meet that criterion.

We agree with the recent decision in *State v. Terrell*, 60 Kan. App. 2d 39, 46, 488 P.3d 520 (2021), which held:  "The reasonable and sensible application of the KSGA is for post-KSGA Kansas convictions to be classified based on the classification in effect at the time of the prior crime of conviction." In that case, as here, the district court changed the classification of one of Terrell's post-KSGA convictions because the Legislature had subsequently changed the felony's person/nonperson classification. The panel held that Terrell's 2004 conviction, which was initially classified as a nonperson felony, was improperly reclassified as a person felony in calculating his criminal history score. 60 Kan. App. 2d at 47. That panel elaborated:

> "A reasonable interpretation of K.S.A. 2020 Supp. 21-6810(d)(8) reflects a legislative intent to classify in-state convictions under subsequently repealed statutes as person or nonperson offenses based on the classification in effect at the time of the prior conviction. But we find nothing in the KSGA reflecting a legislative intent to *reclassify*

24

prior post-KSGA convictions based on subsequent amendments to existing statutes. Compare K.S.A. 2020 Supp. 21-6810(d)(8) with K.S.A. 2020 Supp. 21-6810(d)(2), (d)(3)(B), (d)(6), and K.S.A. 2020 Supp. 21-6811(e)(3)." 60 Kan. App. 2d at 47.

The *Terrell* panel came to this conclusion based on the principle of statutory construction known as *expressio unius est exclusio alterius*, i.e., the inclusion of one thing implies the exclusion of another. Under that principle, the panel explained that

"the Legislature has provided four distinct times where the KSGA specifically directs a sentencing court to compare the prior conviction to the comparable in-state offense as of the date of the current crime of conviction in order to classify it as a person or nonperson offense:

- pre-KSGA Kansas adult felony convictions under K.S.A. 2020 Supp. 21-6810(d)(2);
- pre-KSGA juvenile felony adjudications under K.S.A. 2020 Supp. 21-6810(d)(3)(B);
- pre-KSGA Kansas adult misdemeanor convictions under K.S.A. 2020 Supp. 21-6810(d)(6); and
- prior out-of-state convictions and juvenile adjudications under K.S.A. 2020 Supp. 21-6811(e)(3)." 60 Kan. App. 2d at 44.

Thus, the panel held:

"The explicit statutory directions in K.S.A. 2020 Supp. 21-6810(d)(2), (d)(3)(B), and (d)(6), and K.S.A. 2020 Supp. 21-6811(e)(3) refer only to *pre-KSGA* in-state and out-of-state convictions or adjudications. The common thread of such convictions is they did not occur under the KSGA and, as such, had no Kansas person or nonperson classification. However, the post-KSGA Kansas Criminal Code generally classifies criminal offenses as person or nonperson. See K.S.A. 2020 Supp. 21-5101 et seq. While there is an obvious need to compare out-of-state convictions and pre-KSGA in-state convictions to current Kansas statutes for classification purposes, there is no such need for post-KSGA in-state convictions; the Kansas Criminal Code generally provides the

25

classification at the time of the crime and related conviction. It seems tenuous at best to believe the Legislature, having provided clear, *explicit* guidance for pre-KSGA offenses under K.S.A. 2020 Supp. 21-6810(d)(2), (d)(3)(B), and (d)(6), and K.S.A. 2020 Supp. 21-6811(e)(3), would only *implicitly* provide for classification of post-KSGA offenses under K.S.A. 2020 Supp. 21-6810(d)(8)." 60 Kan. App. 2d at 46.

Because Jackson's prior identity theft conviction occurred after enactment of the KSGA, we find *Keel* inapplicable and instead agree with *Terrell* that under K.S.A. 2020 Supp. 21-6810(d)(8), post-KSGA Kansas convictions are to be classified based on the classification in effect at the time of the prior crime of conviction. Therefore, in 2004, when Jackson was convicted of identity theft, the Legislature classified the crime as a person felony. Therefore, the district court correctly classified that conviction as a person felony under K.S.A. 2020 Supp. 21-6810(d)(8) for the purposes of determining her criminal history score. Jackson's sentence is not illegal, and the district court correctly calculated her criminal history score.

## IV.   IS JACKSON'S RESTITUTION ORDER ILLEGAL?

Next, Jackson argues that her restitution order is illegal. While she does not challenge the restitution amount, she argues the plain language of K.S.A. 2019 Supp. 21-6604(b) requires the district court to establish a plan of restitution repayment when ordering restitution. Because the district court failed to do so, Jackson reasons, its restitution order is illegal. Jackson asks us to vacate the restitution order and remand to the district court so that it may establish a restitution plan of repayment.

Restitution is part of a defendant's sentence. *State v. Johnson*, 309 Kan. 992, 996, 441 P.3d 1036 (2019). A court can "correct an illegal sentence at any time while the defendant is serving such sentence." K.S.A. 2020 Supp. 22-3504(a). A sentence is illegal when:  (1) it is imposed by a court without jurisdiction; (2) it does not conform to the applicable statutory provisions, either in character or the term of punishment; or (3) it is

26

ambiguous about the time and manner in which it is to be served. K.S.A. 2020 Supp. 22-3504(c)(1); *State v. Hambright*, 310 Kan. 408, 411, 447 P.3d 972 (2019). However, a sentence is not illegal "because of a change in the law that occurs after the sentence is pronounced." K.S.A. 2020 Supp. 22-3504(c)(1). A change in the law is one made by a statutory change or a Kansas appellate court opinion, "unless the opinion is issued while the sentence is pending an appeal from the judgment of conviction." K.S.A. 2020 Supp. 22-3504(c)(2). Jackson argues this order of restitution constitutes an illegal sentence because it does not conform to the requirements of K.S.A. 2019 Supp. 21-6604(b) and because it is ambiguous with respect to the time and manner in which it is to be served. See K.S.A. 2020 Supp. 22-3504(c)(1).

We review the "'amount of restitution and the manner in which it is made to the aggrieved party'" for an abuse of discretion, and we exercise unlimited review of legal questions involving the interpretation of the underlying statutes. *State v. Martin*, 308 Kan. 1343, 1349-50, 429 P.3d 896 (2018).

The district court ordered Jackson to pay $5,000 in restitution to the Crime Victims Compensation Board. At sentencing, Jackson's counsel loosely objected to the order of restitution, stating, "My client's going to prison. I mean, I certainly don't know how she's going to pay it while she's there. So I will object at this time but let the Court make that call." The district judge did not alter the amount of restitution and did not specify whether payment was to be made immediately, later, or in installments. Instead, the district judge stated, "Well, I will order in the amount of $5,000, though I will say I'm not sure if and when that would be collected. But I will order it."

When Jackson was sentenced in August 2019, K.S.A. 2019 Supp. 21-6604(b) governed restitution orders and stated in relevant part:

27

"(1) . . . [T]he court shall order the defendant to pay restitution . . . unless the court finds compelling circumstances that would *render a plan of restitution unworkable*. . . . If the court *finds a plan of restitution unworkable*, the court shall state on the record in detail the reasons therefor.

"(2) . . . If, after 60 days from the date restitution is ordered by the court, a defendant is found to be *in noncompliance with the plan established by the court for the payment of restitution*, . . . the court shall assign an agent . . . to collect the restitution on behalf of the victim." (Emphases added.)

While this case has been on appeal, another panel of this court held that this statute required the district court to set a restitution plan. *State v. Roberts*, 57 Kan. App. 2d 836, 845, 461 P.3d 77, *vacated and remanded* 2020 WL 8269363, at *1 (2020). Jackson bases her argument that her restitution order is illegal on the *Roberts* opinion. But subsequent to the briefing in this case, *Roberts* was summarily vacated by our Supreme Court and remanded to the panel for consideration of the statutory amendments to K.S.A. 2019 Supp. 21-6604 and K.S.A. 2019 Supp. 21-6607. 2020 WL 8269363, at *1. Moreover, a different panel of this court took the contrary opinion and held that K.S.A. 2017 Supp. 21-6604(b), which is identical in relevant part with the 2019 version, contained no requirement that the sentencing court establish a plan for the repayment of restitution. *State v. Garza*, No. 118,840, 2019 WL 1412444, at *5 (Kan. App.) (unpublished opinion), *rev. denied* 310 Kan. 1066 (2019).

The State advances two lines of defense against Jackson's argument. First, it argues that *Roberts* was wrongly decided as it took inconsistent views of the meaning of the word "plan" in the statute. The State contends that the plain language of K.S.A. 2019 Supp. 21-6604(b) does not require the district court to make a restitution payment plan for Jackson. Second, it argues that the 2020 amendments to K.S.A. 21-6604(b) operate retroactively and effectively overrule *Roberts.* The State also argues that the 2020 amendments provide Jackson an avenue by which she can seek relief.

28

The State is correct that subsequent to *Roberts*, and perhaps in response to the panel's opinion, the Legislature amended K.S.A. 21-6604(b), effective June 11, 2020, to remove all references to a restitution plan. L. 2020, ch. 9, § 1. The amended version states:

> "(1) . . . Restitution shall be due immediately unless: (A) The court orders that the defendant be given a specified time to pay or be allowed to pay in specified installments; or (B) the court finds compelling circumstances that would *render restitution unworkable*, either in whole or in part. . . . If the court *finds restitution unworkable*, either in whole or in part, the court shall state on the record in detail the reasons therefor.
>
> "(2) . . . If, after 60 days from the date restitution is ordered by the court, a defendant is found to be *in noncompliance with the restitution order*, . . . the court shall assign an agent . . . to collect the restitution on behalf of the victim." (Emphases added.) K.S.A. 2020 Supp. 21-6604(b).

The changes between the 2019 and 2020 versions primarily function to remove any allusion to a restitution plan from the language of the statute. The phrase "would render a restitution plan unworkable" in the 2019 version became "would render restitution unworkable" in the 2020 version, while the phrase "if the court finds a restitution plan unworkable" became "if the court finds restitution unworkable." Finally, the language "in noncompliance with the plan established by the court for the payment of restitution" became "in noncompliance with the restitution order." These alterations to the statutory language are not substantive except in the removal of any reference to a plan.

With the 2020 amendments, the Legislature also added both a retroactivity clause and a subsection providing an avenue for relief for a defendant who was not given a specified time to pay restitution or a restitution installment plan. The retroactivity clause reads as follows: "The amendments made to this section by this act are procedural in nature and shall be construed and applied retroactively." K.S.A. 2020 Supp. 21-6604(v).

The other new subsection allows a defendant who is subject to a restitution order issued prior to the effective date of the 2020 amendments and which lacks a specified time to pay or an installment plan until December 31, 2020, to file a motion with the sentencing court seeking such a restitution order:

> "If a restitution order entered prior to the effective date of this act does not give the defendant a specified time to pay or set payment in specified installments, the defendant may file a motion with the court prior to December 31, 2020, proposing payment of restitution in specified installments. The court may recall the restitution order from the agent assigned pursuant to K.S.A. 20-169, and amendments thereto, until the court rules on such motion. If the court does not order payment in specified installments or if the defendant does not file a motion prior to December 31, 2020, the restitution shall be due immediately." K.S.A. 2020 Supp. 21-6604(b)(3).

In her reply brief, Jackson outlines what she sees as numerous faults with the 2020 amendments and argues they cannot be applied retroactively to eliminate her right to a restitution payment plan. Alternatively, Jackson submits that if the 2020 amendments do apply, then "she requests remand under K.S.A. 2020 Supp. 21-6604(b)."

A. *The restitution order is legal under K.S.A. 2019 Supp. 21-6604(b).*

We need not address the State's position that the 2020 amendments to K.S.A. 2019 Supp. 21-6604(b) apply retroactively because we agree with both the State and the panel in *Garza* that K.S.A. 2019 Supp. 21-6604(b) does not render Jackson's restitution order illegal as its plain language does not require the district court to order a restitution payment plan. *Garza*, 2019 WL 1412444, at *6.

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained.

>     "'An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. . . . Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history . . . to construe the legislature's intent.' [Citation omitted.] *State v. Pulliam*, 308 Kan. 1354, 1364, 430 P.3d 39 (2018).

"[W]hen construing statutes to determine legislative intent, [we] must consider various provisions of an act in pari materia, with a view toward reconciling and bringing the provisions into workable harmony if possible." *Keel*, 302 Kan. at 573-74.

Like the *Garza* panel, we find it significant that our Supreme Court, when construing K.S.A. 2019 Supp. 21-6604(b), has not held that the district court must set out a restitution payment plan. See *State v. Alderson*, 299 Kan. 148, 151, 322 P.3d 364 (2014); see also *State v. Jamerson*, 54 Kan. App. 2d 312, 316-17, 399 P.3d 246 (2017) (when district court fails to make clear that restitution is due immediately, it becomes due when prisoner is released from prison). In fact, the State's position that the plain language of K.S.A. 2019 Supp. 21-6604(b) does not require the district court to establish a restitution payment plan is bolstered by other Kansas Supreme Court opinions which have upheld restitution orders without payment plans. See *State v. Alcala*, 301 Kan. 832, 840, 348 P.3d 570 (2015) (restitution order which did not specify monthly payments or when payments were to begin upheld). Moreover, as we have mentioned, our Supreme Court vacated the holding in *Roberts* while it declined to review *Garza*'s contrary holding.

Jackson latches onto the phrase "plan of restitution" and argues this requires the district court to order a payment plan when ordering restitution. "However, the statute makes no mention of any sort of payment plan that must be set up by the district court. Instead, the phrase 'plan of restitution' simply refers to the plan that a defendant begin

paying restitution when he or she is released from prison." *Garza*, 2019 WL 1412444, at *5. We agree with the *Garza* panel's conclusion that to adopt the view that the statute requires a restitution payment plan is to read language into the statute that is not there, something we are not permitted to do. 2019 WL 1412444, at *5. Thus, the district court's restitution order was legal because it set the amount owed by Jackson; nothing more was required by K.S.A. 2019 Supp. 21-6604(b).

But Jackson also cites to the language contained in K.S.A. 2019 Supp. 22-3717(n), which states that when a prisoner is released from incarceration, "the prisoner review board shall order as a condition of parole or postrelease supervision that the inmate pay restitution in the amount and manner provided in the journal entry . . . ." She argues that this language, when read in conjunction with K.S.A. 2019 Supp. 21-6604(b), bolsters her claim that a restitution payment plan is required. "But the statute does not mention a payment plan, nor does it obligate the sentencing court to establish a payment plan when ordering restitution. Instead, it simply requires the prisoner review board to comply with the sentencing court's restitution order." *Garza*, 2019 WL 1412444, at *6. Thus, the restitution order conforms with the requirements of the restitution statute.

Also, there is no ambiguity to the district court's restitution order. As we have already outlined, the district court clearly set out the restitution amount, which Jackson does not challenge. As to when restitution is to become due and owing, given the district court's silence, it does not become due until Jackson is released from prison. See *Alderson*, 299 Kan. at 151. Jackson's restitution order is legal.

B.     *It is too late to seek relief under K.S.A. 2020 Supp. 21-6604(b)(3).*

Although the restitution statute was amended after Jackson was sentenced, our Supreme Court has held that "in a direct appeal, a defendant will receive the benefit of any change in the law that occurs while the direct appeal is pending." *State v. Murdock*,

32

309 Kan. 585, 591, 439 P.3d 307 (2019). One such benefit included in the 2020 amendments to K.S.A. 21-6604 is the addition of new subsection (b)(3), which allows defendants with restitution orders imposed prior to the enactment of the 2020 amendments to seek a revised restitution order in the district court allowing restitution to be paid in installments. But this provision contains a deadline for seeking relief of December 31, 2020. See K.S.A. 2020 Supp. 21-6604(b)(3). Jackson asks us, in the alternative, that should we deny her request for relief under the restitution statute as it existed at the time she was sentenced—which we have—to remand the case to the district court for that purpose.

Another panel of this court considered the 2020 amendments in *State v. Logan*, No. 122,116, 2021 WL 645929 (Kan. App. 2021) (unpublished opinion). Logan's restitution order was likewise issued before the 2020 amendments and did not include a payment plan. While his appeal was pending, Logan requested the panel to stay the appeal and remand the case to the district court so that Logan could timely file a motion regarding the method of paying for restitution with the district court. The panel granted the stay and the remand. But at a December 15, 2020, hearing before the district court, Logan waived his right to have a payment plan established, yet he also stated he was not waiving his right to request a payment plan in the future, once his appeal was final. Once back before our court, the panel lifted the stay and issued a decision in which it noted that Logan's "remedy for the district court's alleged error in not providing a payment plan for its order of restitution lies solely with the district court by making a timely motion under K.S.A. 2020 Supp. 21-6604(b)(3)." *Logan*, 2021 WL 645929, at *4. The panel further found that Logan failed to adequately support his claim that he was entitled to some future right to have the district court establish installment payments once his appeal was final and deemed that argument abandoned. 2021 WL 645929, at *4.

We also note that the *Roberts* panel, after having the case sent back to it by our Supreme Court, did remand the case to the district court to allow the defendant to motion

33

the district court for relief under K.S.A. 2020 Supp. 21-6604(b)(3). However, that remand order was issued in October 2020, prior to the expiration of the December 31, 2020, deadline.

Here, Jackson's appeal was docketed on September 16, 2019; Jackson filed her first brief on May 5, 2020, and her reply brief on September 23, 2020—well before the statutory December 31, 2020 deadline. However, Jackson has never asked us for a stay of her appeal as Logan did, and the deadline for that avenue of relief has now passed. Given that K.S.A. 2020 Supp. 21-6604(b)(3) stipulates that a defendant seek relief in the district court, not an appellate court, Jackson's remedy lies there. As Jackson failed to avail herself of the statutory right to file a motion in the district court or request a stay from us to do so prior to the deadline, K.S.A. 2020 Supp. 21-6604(b)(3) now provides no avenue whereby Jackson is entitled to request that her restitution be paid in specified installments.

V.     DID THE DISTRICT COURT VIOLATE JACKSON'S CONSTITUTIONAL RIGHTS WHEN IT FAILED TO REQUIRE THE STATE TO PROVE HER PRIOR CONVICTIONS BEYOND A REASONABLE DOUBT BEFORE USING THOSE CONVICTIONS TO INCREASE HER SENTENCE?

Finally, Jackson argues the district court violated her rights under the Sixth and Fourteenth Amendments to the United States Constitution when it used her prior convictions to enhance her sentence without requiring the State to prove those prior convictions to a jury beyond a reasonable doubt. See *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (any fact that increases defendant's maximum penalty must be proven to jury beyond reasonable doubt). Jackson recognizes the Kansas Supreme Court has rejected this argument, but she includes the issue to preserve it for federal review. See *State v. Sullivan*, 307 Kan. 697, 708, 414 P.3d 737 (2018); *State v. Ivory*, 273 Kan. 44, 46-47, 41 P.3d 781 (2002); see also *State v. Raschke*,

289 Kan. 911, 912, 219 P.3d 481 (2009) ("We reject this claim as controlled by . . . [*Ivory*]. It requires no further discussion."). Because there is no indication the Kansas Supreme Court is departing from this position, we are duty-bound to follow established precedent. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). The district court correctly determined Jackson's criminal history to establish her sentence.

Affirmed.